UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| CHRISTOPHER HALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:23-CV-294-KAC-DCP |
| | ) | |
| RELYANT GLOBAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Defendant Relyant Global, LLC's "Motion for Summary Judgment" [Doc. 18]. For the following reasons, the Court grants Defendant's Motion.

**I.    Background**[1]

As relevant here, Defendant employed Plaintiff Christopher Hale as a "UXO quality control" worker at a Guam work site from mid-2021 until his termination on July 1, 2022 [*See* Docs. 18-2 at 7, 10 (Deposition of Christopher Hale ("Hale Dep.") 29:10-13, 58:15-17); 21-2 at 5, 11 (Hale Dep. 38:18-23, 53:5-11)]. Defendant terminated Plaintiff after a 2022 accident involving the company vehicle Defendant gave Plaintiff [*See* Doc. 18-4 at 18 (Deposition of Donald Patton ("Patton Dep.") 85:4-9)].

Plaintiff's job involved "safety-related supervision" on Defendant's work site in Guam, [*see* Doc. 21-4 at 1 (Job Description Letter)], such as ensuring Defendant complied with "procedures. . . [from the] Corp of Engineer guidelines" and other "Department of Defense Explosives Safety Board designates," [*see* Doc. 21-1 at 5 (Patton Dep. 69:4-22); *see also* Doc.

---

[1] Because Plaintiff Christopher Hale is the nonmoving Party, the Court describes the facts in the light most favorable to him. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

1

21-2 at 5-6 (Hale Dep. 38:24-39:10)]. As part of Plaintiff's compensation package, Defendant gave him a "company vehicle with fuel card" [*See* Doc. 21-3 at 1 (Offer Letter)].

Defendant had certain policies and procedures for use of company vehicles [*See* Doc. 21-2 at 34 (Hale Dep. 129:1-21)]. Plaintiff was aware of those policies and procedures [*See id.* at 34-35 (Hale Dep. 129:1-131:1-14)]. They provided that "[c]ompany vehicles while intended primarily for . . . business use, may also be used for commuting to and from work and for limited personal use (must be pre-approved by the Program Director)" [*See* Doc. 21-10 at 3 (Company Vehicle Policies and Procedures)]. "Evening and weekend travel" were "prohibited unless conducting company business after normal business hours" [*Id.*]. They further prohibited "the use of a company vehicle for anything other than the tasks pertaining to the employee's job and responsibilities" at Relyant [*Id.*].

In the event of an accident, those procedures required an employee in possession of a vehicle to (1) "notify local police" and "Safety Personnel" at Defendant, (2) complete a Relyant "accident reporting form . . . as completely and quickly as possible for submission to the Logistics Manager," and (3) "[c]ontact Safety Personnel and [the] Human Resources [("HR")] manager within the first 24 hours . . . [after] the accident" [*Id.* at 5-6; *see also* Doc. 21-15 (noting that the word "preceding" is a typographical error in the text of the policy)]. Defendant's employee handbook and policies provided that Defendant may "send employees for a substance abuse test if they are involved in on-the-job accidents where personal injury or damage to RELYANT property occurs" [*See* Docs. 18-4 at 6 (Patton Dep. 50:14-20), 18-3 at 1 (Declaration of Norma Henning ("Henning Decl.") ¶ 4)].

2

### A. Plaintiff's Conditions

"[W]hen he was a child," Plaintiff was originally diagnosed with Attention-Deficit Hyperactivity Disorder (ADHD), but he stopped taking medication to treat it at some point during childhood [*See* Docs. 21-2 at 14 (Hale Dep. 60:16-25), 21-5 at 1 (Patient Notes)]. He lived and worked for years without mention of a disability because his diagnosis "fell to the wayside" [*See, e.g.,* Doc. 21-2 at 14 (Hale Dep. 60:16-25)]. Then in late 2021 or early 2022 Plaintiff was diagnosed with Generalized Anxiety Disorder (GAD) and ADHD [*See* Doc. 18-2 at 13 (Hale Dep. 65:4-12); *see also* Doc. 21-6 at 1 (Plaintiff's Medical Records)].

At that point, Plaintiff had performed his relevant job at Relyant for many months without performance issues [*See* Docs. 21-2 at 36 (Hale Dep. 137:1-12), 18-4 at 7-8 (Patton Dep. 72:11-73:20)]. Plaintiff's physician prescribed Ritalin to treat his ADHD [*See* Doc. 21-2 at 11 (Hale Dep. 63:5-9)]. Plaintiff did not seek an accommodation from Defendant because he "did not need one" [*See* Doc. 21-2 at 36 (Hale Dep. 137:1-12)]. Rather, Plaintiff proceeded in his job as he had previously without interruption [*See* Docs. 21-2 at 36 (Hale Dep. 137:1-12), 18-4 at 7-8 (Patton Dep. 72:11-73:20)].

Plaintiff did, however, discuss his diagnoses and treatment with several of his coworkers and supervisors in Guam "just after" receiving the diagnoses [*See* Doc. 18-2 at 8-9 (Hale Dep. 56:11-57:1)]. Specifically, before his termination, Plaintiff discussed his diagnoses with Derrick Rowe, Michael Brettelle, and Brian Sunderman [*See* Docs. 18-2 at 8-9, 14-15 (Hale Dep. 56:11-57:1, 66:17-67:6); 21-2 at 9-10 (Hale Dep. 49:13-50:25)]. Rowe, Defendant's UXO quality control manager in Guam, was Plaintiff's direct supervisor [Doc. 21-2 at 6 (Hale Dep. 39:7-16)]. Plaintiff directly reported to Brettelle and Sunderman too [*See* Doc. 21-1 at 8-9 (Patton Dep. 74:22-

3

75:14)]. Brettelle was the project manager [*See* Doc. 21-1 at 4 (Patton Dep. 67:3-5)]. And Sunderman served as the munitions operations manager in Guam [*Id.* at 3 (Patton Dep. 66:18-23)].

Plaintiff did not believe that "anyone other than Relyant management on Guam" were aware of his diagnoses [*See* Doc. 18-2 at 10 (Hale Dep. 58:11-22)]. He did not disclose his diagnoses to Defendant in writing before his termination [*See id.* at 9 (Hale Dep. 57:11-16)]. And he did not seek to make his diagnoses or medication part of his record with Defendant [*See* Doc. 18-3 at 1 (Henning Decl. ¶ 3)]. None of the records that Plaintiff provided to Defendant "reflect that [Plaintiff] ever disclosed that he had a disability to . . . [Defendant] at any time prior to his termination" [*Id.*].

### B. Plaintiff's 2021 And 2022 Company Vehicle Accidents

During Plaintiff's employment, two different accidents occurred involving his company vehicle. The first, in October 2021, was a single-car accident [*See* Doc. 18-4 at 9-10 (Patton Dep. 76:4-77:13)]. Plaintiff flipped his company vehicle onto its side in the parking lot of the restaurant in Guam where he had been eating [*Id.*]. Plaintiff followed company procedure, notifying local police and the appropriate individuals with Defendant; filing an accident report form with Defendant; and voluntarily submitting to a post-accident urinalysis [*See* Doc. 18-4 at 122-25 (2021 Accident Report Forms); *see also* Doc. 21-1 at 10-11 (Patton Dep. 76:7-77:13)]. Defendant investigated the incident and cleared Plaintiff of any wrongdoing [*See* Doc. 21-1 at 10-11 (Patton Dep. 76:7-77:13)].

The second accident occurred on June 18, 2022 [*See* Doc. 21-2 at 17, 18 (Hale Dep. 67:14-20, 68:5-23); *see also* Doc. 18-5 at 1-2 (Declaration of Chris Greenamyer ("Greenamyer Decl." ¶¶ 3-4))]. While Plaintiff was golfing with coworkers in Guam, an unknown driver struck Plaintiff's unattended company vehicle in the parking lot [Doc. 18-4 at 9-10 (Patton Dep. 76:4-

4

77:13)]. Plaintiff only became aware of the damage after the accident occurred [Doc. 21-2 at 17-18 (Hale Dep. 67:21-68:18)]. When Plaintiff noticed the damage, he notified Brettelle, who had been golfing with Plaintiff [*Id.* at 18-19 (Hale Dep. 68:19-69:7)].

Brettelle informed Plaintiff that he "would take care of the Accident Report" [*Id.* at 19 (Hale Dep. 69:8-20)]. Brettelle told Plaintiff that he did not need to report the accident to anyone else [*Id.* at 38 (Hale Dep. 155:21-25)]. Plaintiff and Brettelle did not submit an accident report until June 30 [Doc. 21-1 at 15 (Patton Dep. 87:17-22)]. Plaintiff did not report the accident to local police or an HR manager [*See* Docs. 21-2 at 22, 24-26 (Hale Dep. 73:6-15, 75:10-78:14); 21-10 at 6-7 (Company Vehicle Policies and Procedures)].

### C. Events After The 2022 Company Vehicle Accident

Once Defendant received the late accident report, Defendant requested that Plaintiff submit to a post-accident urinalysis drug screen, as he had for the 2021 accident [*See* Doc. 21-2 at 24-25 (Hale Dep. 75:10-76:5)]. Plaintiff opposed the screen [*See id.*]. On a June 30, 2022 phone call, Plaintiff informed Defendant's HR representative that he believed the screen was "improper" [*See id.*]. Plaintiff did not inform Defendant of his diagnoses at that time [*Id.*].

Defendant's drug testing policies prevented disclosure of any disability if an employee tested positive during a urinalysis [*See* Doc. 18-3 at 1-2 (Henning Decl. ¶ 5)]. An independent medical official would review any positive test result and give the employee an opportunity to explain or contest the result [*See* Doc. 18-4 at 67-68 (Drug Test Policy)]. If the employee's explanation or contest of the test was unsatisfactory, the independent medical officer would then report to Defendant *only* that the employee had a positive drug test result, ***nothing more*** [*Id.*]. No information relating to what substance Plaintiff might have tested positive for or whether he had a

5

disability would have been revealed by the urinalysis Defendant requested [*See* Docs. 18-4 at 67-68 (Drug Test Policy), 18-3 at 1-2 (Henning Decl. ¶ 5)].

On July 1, 2022, Plaintiff met in-person with Defendant's HR representative; Defendant's program director, Ron Boyd; and Brettelle to discuss the 2022 accident and his opposition to the urinalysis [*See* Doc. 21-2 at 26 (Hale Dep. 78:1-5)]. To support his opposition, Plaintiff brought documentation to the meeting from the Occupational Safety and Health Administration, the Federal Motor Carrier Service Act, sections from Defendant's employee handbook, and an HR resource Plaintiff found online regarding employers requesting a medical examination [*Id.* at 26 (Hale Dep. 78:6-23)]. The HR representative asked Plaintiff to reiterate his concerns, and Plaintiff again stated that he believed the urinalysis would be improper [*Id.* at 26 (Hale Dep. 78:6-23)]. Eventually, Plaintiff informed those at the meeting of his diagnoses and that his opposition to the urinalysis was tied to his diagnoses [*Id.* at 29 (Hale Dep. 83:1-4)].

Defendant's HR representative and Boyd left the room [*Id.* at 27 (Hale Dep. 79:8-22)]. At some point later, they returned with a letter terminating Plaintiff's employment [*Id.* at 27 (Hale Dep. 79:8-22)]. During litigation, Defendant stated that it terminated Plaintiff for failing to timely report the 2022 Accident and a refusing to submit to a post-accident urinalysis drug screen [*See* Docs. 18-4 at 28 (Patton Dep. 95:14-24), 18-5 at 2 (Greenamyer Decl. ¶ 4)]. Defendant asserted that these were violations of its policies [*See* Docs. 18-4 at 28 (Patton Dep. 95:14-24), 18-5 at 2 (Greenamyer Decl. ¶ 4)].

The decision to terminate Plaintiff's employment rested solely with Defendant's Vice President for the Middle East/Europe/Asia-Pacific, Chris Greenamyer [*See* Doc. 18-5 at 1-2 (Greenamyer Decl. ¶¶ 3-4))]. Defendant's Director of HR, Norma Henning, and President, Donald Patton, recommended Plaintiff's termination [*See id.*]. Neither was aware of Plaintiff's diagnoses

[*See* Doc. 18-3 at 1 (Henning Decl. ¶¶ 3-4), 18-4 at 28-29, 31 (Patton Dep. 95:14-96:17, 97:18-98:7)]. Greenamyer; who worked in Defendant's Maryville, Tennessee home office; too "was not aware that" Plaintiff was diagnosed with ADHD or GAD [Doc. 18-5 at 1-2 (Greenamyer Decl. ¶¶ 3-4)]. He did not "perceive[] . . . [Plaintiff] to be disabled" [*Id.* at 2 (Greenamyer Decl. ¶ 5)]. And Greenamyer did not have "any reason to suspect that . . . [Plaintiff] might be disabled" [*Id.* (Greenamyer Decl. ¶ 5)].

The Equal Employment Opportunity Commission (EEOC) issued Plaintiff a right to sue letter [Docs. 8 ¶ 4; 8-1 at 1-2]. Then Plaintiff filed suit [*See* Doc. 1]. Plaintiff's operative Amended Complaint asserts claims of: (1) disability discrimination under the Americans with Disabilities Act ("ADA"); (2) unlawful medical inquiry under the ADA; and (3) retaliation under the ADA [*See* Doc. 8 ¶¶ 37-63]. Defendant filed a "Motion for Summary Judgment" [Doc. 18] on all claims; Plaintiff opposed, [Doc. 21]; and Defendant replied, [Doc. 24].

## II. Legal Standard

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences from those facts in his favor. *See Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the burden of demonstrating that no genuine dispute of material fact exists. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 323 (6th Cir. 2023) (citation omitted). Once the moving party satisfies this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *See Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022) (quotation omitted).

A "party may not avoid summary judgment by resorting" to "speculation" or "conjecture." *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (2018) (quotation omitted). Nor do "conclusory and unsupported allegations . . . meet [the summary judgment] burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (citation omitted). Instead, "[a] genuine issue of material fact exists" only if "there are disputes over" specific facts "that might affect the outcome of the suit." *See Regions Bank v. Fletcher*, 67 F.4th 797, 802 (6th Cir. 2023) (citation and quotation omitted). The Court does "not weigh the evidence or make credibility determinations." *See Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021). But a "mere existence of a scintilla of evidence in support of" a nonmovant's position is "insufficient" to defeat summary judgment. *See Bennett*, 86 F.4th at 323 (citation omitted).

III.   **Analysis**

   A. **Claim One: Defendant Is Entitled To Summary Judgment On Plaintiff's ADA Disability Discrimination Claim.**

The ADA bars an employer from discriminating against an employee "on the basis of his disability." *See* 42 U.S.C. § 12112(a). Plaintiff relies on circumstantial evidence to support his disability discrimination claim [*See* Doc. 21 at 7]. So, he "must establish a prima facie case using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *See Carroll v. IDEMIA Identity and Security USA, LLC*, No. 23-6075, 2025 WL 1027867, at *4 (6th Cir. Apr. 7, 2025) (citing *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 452-53 (6th Cir. 2004)). As relevant here, Plaintiff "must show that (1) he has a disability, (2) he was 'otherwise qualified for the position with or without reasonable accommodation,' (3) he 'suffered an adverse employment decision;'" *see Cook v. Warren Screw Products, Inc.*, No. 24-1192, 2025 WL 933637, at *3 (6th Cir. Mar. 27, 2025) (quoting *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017)); (4) "the individual decisionmaker responsible" for the adverse employment

8

decision "has knowledge of that disability;" *see Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016); and "(5) he was replaced or his position remained open," *see Cook*, 2025 WL 933637, at *3 (quotation omitted). Defendant argues that Plaintiff failed to satisfy the first and fourth elements of the prima face case [*See* Doc. 18 at 9-11].

Even if Plaintiff had a "disability" under the ADA, a proposition that is hard to square with his employment record and history, he fails to identify evidence showing that the individual decisionmaker at Defendant, Greenamyer, knew of any "disability." Generally, an employee cannot make a prima facie case of disability discrimination based on termination "unless the individual decisionmaker responsible for [the termination] has knowledge of that disability."[2] *See Tennial*, 840 F.3d at 306 (citing *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013)). It is not sufficient for the decisionmaker to know of only "some symptoms" or restrictions. *See Mirrotto v. TJB Inc.*, No. 23-3648, 2024 WL 3688303, at *2 (6th Cir. May 24, 2024) (citing *Messenheimer v. Coastal Pet Prods., Inc.*, 764 F. App'x 517, 519 (6th Cir. 2019), *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015)).

Here, Plaintiff has identified no facts that would allow the Court to infer that Greenamyer had knowledge of any "disability" pretermination. At the time Plaintiff was terminated, Greenamyer was unaware of Plaintiff's "disability," had no reason to believe Plaintiff was disabled, and did not perceive Plaintiff as disabled [*See* Doc. 18-5 at 1-2 (Greenamyer Decl. ¶¶ 2-5)]. None of the records that Plaintiff provided to Defendant "reflect that [Plaintiff] ever disclosed that he had a disability to . . . [Defendant] at any time prior to his termination" [Doc.

---

[2] An employer could be liable under a "cat's paw" theory "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment" decision and "that act is a proximate cause of the ultimate employment" decision. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (alterations in original) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). But Plaintiff does not advance that theory.

9

18-3 at 1 (Henning Decl. ¶ 3)]. And even the two individuals who recommended Plaintiff's termination, Henning and Patton, were unaware of Plaintiff's diagnoses [*See id.* (Henning Decl. ¶¶ 3-4); Doc. 18-4 at 28-29, 31 (Patton Dep. 95:14-96:17, 97:18-98:7)]. This is consistent with Plaintiff's sworn testimony that only a few of Defendant's employees in Guam knew of his alleged disabilities [*See* Doc. 18-2 at 10 (Hale Dep. 58:18-22)]. Accordingly, the Court grants Defendant summary judgment on Claim One.

### B. Claim Two: Defendant Is Entitled To Summary Judgment On Plaintiff's ADA Unlawful Medical Inquiry Claim.

Plaintiff's next claim fairs no better. The ADA provides that employers "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). But "a test to determine the illegal use of drugs **shall not** be considered a medical examination." *Id.* § 12114(d)(1) (emphasis added). There are two key questions: (1) whether the employer performed or authorized a medical examination; and if so, (2) whether the exam was "job-related and consistent with business necessity." *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 572 (6th Cir. 2014). If Plaintiff can establish that Defendant required a medical examination, Defendant would "bear[] the burden of proving that a medical examination is job-related and consistent with business necessity." *See Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014).

In binding precedent, the United States Court of Appeals for the Sixth Circuit has relied on "EEOC guidance" to help the Court understand[3] the term "medical examination." *See Bates*, 767

---

[3] The Court only relied on the Guidance to the extent it was "persuasive." *See Bates*, 767 F.3d at 574 (quotations and citations omitted).

F.3d at 574 (quoting EEOC, *Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* Part B.2 (July 27, 2000) (hereinafter "*Guidance*")). The Court relied on "several factors" from the Guidance to assess whether a "medical examination" was requested or performed:

> (1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.

*Id.* at 574-75 (quoting *Guidance*). Of these factors, the third factor is "the most critical in the analysis." *Id.* at 576 (quoting *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 819 (6th Cir. 2012)). This makes sense because the text of the ADA concerns only a medical examination that would show "whether such employee is an individual with a disability" or the "nature or severity" of a disability. *See* 42 U.S.C. § 12112(d)(4)(A). And "one factor may be enough." *Bates*, 767 F.3d at 575 (cleaned up).

Defendant's required post-accident urinalysis does not meet the definition of "medical examination" under the ADA. The most critical factor—whether the test is designed to reveal an "impairment or physical or mental health"—ends the inquiry because the urinalysis at issue did not risk revealing Plaintiff's diagnoses to Defendant. Defendant's urinalysis procedures ensured that to the extent any "impairment or physical or mental health" issue was discovered, it would not be reported to Defendant [*See* Docs. 18-3 at 1-2 (Henning Decl. ¶ 5); 18-4 at 67-68 (Drug Test Policy)]. The urinalysis was essentially a drug test, and even if the drug test had been positive for some substance, an independent medical officer would only report to Defendant the fact of a positive drug test [*See* Doc. 18-4 at 67-68 (Drug Test Policy)]. The text of the ADA itself makes clear that "a test to determine the illegal use of drugs **shall not** be considered a medical

11

Case 3:23-cv-00294-KAC-DCP    Document 35    Filed 06/10/25    Page 11 of 13
PageID #: 451

examination." 42 U.S.C. § 12114(d)(1). Accordingly, the Court grants Defendant summary judgment on Claim Two.

### C. Claim Three: Defendant Is Entitled To Summary Judgment On Plaintiff's ADA Retaliation Claim.

Plaintiff's third claim fails too. "The ADA provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act.'" *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 662 (6th Cir. 2020) (quoting 42 U.S.C. § 12203(a)); *see also Cook*, 2025 WL 933637, at *5. Where, as here, a plaintiff relies on circumstantial evidence, the Court analyzes an ADA retaliation claim under the *McDonnell Douglas* framework. *See Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 304 (6th Cir. 2019). "To establish a prima facie case of retaliation, a plaintiff must show that '(1) he engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.'" *Id.* (citation omitted).

Plaintiff alleges that Defendant fired him "in retaliation for his objection to Defendant's unlawful medical inquiry"—the post-accident urinalysis drug screen [*See* Doc. 8 ¶ 49]. Defendant contests the first, second, and fourth elements of the prima facie case [*See* Doc. 18 at 12-13].

Plaintiff falters at his prima facie case. "Protected activity . . . [under the ADA] refers to action taken to protest or oppose . . . statutorily prohibited discrimination." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citation omitted). But as discussed above, Defendant's post-accident urinalysis was not prohibited by the ADA. Thus, Plaintiff objected to lawful conduct not prohibited by the ADA. *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 814 (6th Cir. 1999) (finding plaintiff's ADA retaliation claim "logically incoherent" where plaintiff's purported protected conduct was the "refus[al] to submit to . . . [lawful medical] exams"); *see also Sloan v.*

12

*Repacorp, Inc.*, 310 F. Supp. 3d 891, 901 (S.D. Ohio 2018) (collecting cases).  Even if Plaintiff had a "belief" that Defendant's post-accident drug testing was violative of the ADA, *see Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 511 (6th Cir. 2016) (cleaned up), he would have to show that "'a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee' would believe that the conduct complained of was unlawful," *see Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) (quoting *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015)).  That he has not done.  And even if Plaintiff had, he fails to set forth facts that would allow the Court to infer that Greenamyer, the sole decisionmaker, had knowledge of Plaintiff's alleged protected activity—protesting the alleged unlawfulness of the drug screen—before his termination.  *See Browning v. Franklin Precision Indus., Inc.*, No. 23-5406, 2023 WL 8437235, at *3 (6th Cir. Dec. 5, 2023) (citing *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)).  Therefore, the Court grants Defendant summary judgment on Claim Three.

## IV. Conclusion

For the above reasons, the Court **GRANTS** Defendant Relyant Global, LLC's "Motion for Summary Judgment" [Doc. 18].  No claims remain in this action.  An appropriate judgment shall enter.

SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge